***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner with some modifications.
 ***********
Accordingly, the Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff-employee and defendant Wal-Mart Corporation on the dates of plaintiff's injuries by accident of August 8, 1998 (injuries to both feet) and December 21, 1998 (back injury).
3. Defendants have accepted liability for both the injuries by accident of August 8, 1998, the injury to the feet (IC File No. 910380) and of December 21, 1998, the back injury (IC File No. 919447), and have paid plaintiff temporary total disability compensation since December 21, 1998 in the amount of $154.91 per week.
4. The parties agree that the following issues are before the Commission in this case:
 (a). Is plaintiff totally permanently disabled as a result of the cumulative injuries of August 8, 1998 and December 21, 1998?
 (b). Is plaintiff required to undergo any vocational rehabilitation?
 (c). Is plaintiff entitled to the treatment recommended by defendants' second opinion physician, Dr. Rowan?
 (d). Is plaintiff's adult son entitled to compensation for the care he has provided to his mother since January 5, 1999?
5. Defendants contend there is also an issue as to whether plaintiff's current disability, if any, is attributable to the injuries of August 8, 1998 and December 21, 1998.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner with some modifications as follows:
 FINDINGS OF FACT
1. On the date of the hearing before the Deputy Commissioner, plaintiff was 66 years of age. She graduated from high school and began working at age 18, doing office clerical work, typing and bookkeeping. Plaintiff worked in clerical positions until 1973 when she married and had a son, and then stayed home to be a full-time mother. Plaintiff has no computer skills or other office experience or training.
2. Plaintiff worked for about three months in 1994 as a cashier at a Lowes Foods. She did not return to further employment until January 1996 when she began working at a McDonald's making biscuits early in the morning. Plaintiff did this job at McDonald's for about three weeks, until she hurt her back lifting a 50-pound bag of flour.
3. Plaintiff was diagnosed with a severe compression fracture at her T12 vertebral body, related to the lifting incident at work. She was treated by Dr. Charles Taft, an orthopaedic specialist whom she first saw in March 1996. Plaintiff's x-rays also showed osteoporosis and secondary kyphosis, a bowing of her back. Dr. Taft treated plaintiff with a three point brace, limited her lifting and took plaintiff out of work.
4. Plaintiff continued to wear the back brace for about a year, and her back healed and improved. As of August 23, 1996 Dr. Taft found plaintiff was at maximum medical improvement from the T12 compression fracture and rated her with a 15 percent permanent impairment to her back. A compression fracture may be painful for 3 to 4 months as it is healing and generally heals within 6 to 8 months.
5. When he rated her on August 23, 1996, Dr. Taft cautioned plaintiff about not lifting over 15 to 20 pounds. In his office notes on plaintiff's return visit of October 25, 1996, Dr. Taft stated that he did not believe plaintiff would be able to return to gainful employment because he did not think she could sit or stand for periods of 6 to 8 hours.
6. In spite of her osteoporosis, the compression fracture and Dr. Taft's concerns, plaintiff showed that she was resilient. In 1996 and 1997 plaintiff continued to live by herself in a one-bedroom apartment, doing her own cooking and cleaning. Eventually she recovered to the point that she could do most of the things she did before her back injury.
7. On July 16, 1998 plaintiff began working for Wal-Mart Stores as a door greeter. On August 26, 1998 plaintiff sustained injuries when another employee pulled a pallet jack over her feet. Plaintiff sought medical treatment at Prime Care on August 30, 1998, at which time she complained primarily about her left foot.
8. X-rays were taken of plaintiff's left foot at Prime Care. No fracture was shown and plaintiff was assessed with a contusion of the left foot. She was treated conservatively, told to use ice and elevate her foot, and was released to return to work with limited walking and standing.
9. Plaintiff returned to Prime Care for a follow-up visit on September 2, 1998. Although her left foot was still swollen and tender, plaintiff indicated she wanted to continue to work. There was no change in the assessment of a contusion of the left foot and plaintiff was released to light duty work. The medical notes reflect that a complete recovery was anticipated.
10. On September 27, 1998 plaintiff was seen at the emergency room of North Carolina Baptist Hospital with complaints of painful swollen feet. X-rays were taken of both feet and these showed no fractures. The final diagnosis of Dr. Ralph Leonard, the attending physician, was contusions of the ventral surfaces of both feet. Dr. Leonard gave plaintiff a work excuse, to return to work on September 29, 1998.
11. On September 29 and October 12, 1998 plaintiff reported to Prime Care with complaints of right foot and ankle pain. She was given a note for light duty work until October 28, 1998. When plaintiff was seen next on October 26, 1998, the Prime Care physician noted a diagnosis of "resolved plantar facitis" and released her to return to work without restrictions.
12. In November 1998 plaintiff returned to Prime Care complaining of pain in her right foot. Plaintiff was placed on light duty initially and then taken out of work November 11-20, 1998. A bone scan, done on November 10, showed abnormal uptake in the mid-thoracic and upper lumbar areas, as well as the third metatarsal of the left foot. Although this type of uptake is often associated with stress fractures, no acute fractures were apparent on the plain films. As a result of the bone scan, the treating physician noted a possible healing left foot fracture, that was previously undetected. As of November 20, 1998 plaintiff was released to return to work without restrictions.
13. On December 21, 1998 plaintiff was helping to straighten merchandise on store shelves. She was asked to move a "sled" that was used for displays during the holidays. The sled was on the top shelves and plaintiff had to use a ladder to get to it. When she moved the sled, plaintiff found that it was heavy and weighed over 20 pounds. As she moved the sled, plaintiff felt a sharp pain in her lower back.
14. Plaintiff went to Prime Care on December 26, 1998, seeking treatment for her back. She was initially taken out of work for two days. When plaintiff returned to the clinic with continued pain complaints on December 28, 1998, she was continued out of work through December 31, 1998. Although she was tentatively released to return to work with restrictions in early January 1999, on January 19, 1999 plaintiff was taken out of work pending an orthopaedic evaluation.
15. Plaintiff was referred back to Dr. Charles Taft and saw him for her back complaints on March 24, 1999. Dr. Taft requested that plaintiff gather any recent x-rays for his review. At her next visit on April 1, 1999 Dr. Taft was first apprised of plaintiff's new injury of December 21, 1998. He assessed new compression fractures at L1 and L2, which were caused or aggravated by the incident of moving the sled on December 21, 1998.
16. In assessing plaintiff's condition, Dr. Taft again stated his opinion that he did not believe plaintiff would be able to return to work due to her osteoporosis and the compression fractures. The compression fractures should have healed within 8 months, but the healing process has been slowed by the plaintiff's smoking habit of one pack per day. Smoking decreases the oxygen flow in the blood and slows the healing of the bone.
17. Plaintiff was also examined by Dr. Frank J. Rowan, an orthopaedic specialist, whom defendants hired to conduct an independent medical examination. Dr. Rowan saw plaintiff on August 10, 1999. Dr. Rowan agreed with Dr. Taft's assessment. As both physicians testified, plaintiff had pre-existing osteoporosis, which made her more susceptible to compression fractures in her spine. The compression fractures at L1 and L2 were caused or significantly aggravated by plaintiff's accident of December 21, 1998.
18. Dr. Rowan also agreed with Dr. Taft's assessment that plaintiff's smoking interferes with the healing of the compression fractures. Dr. Rowan was emphatic that it was important for plaintiff to quit smoking. Although the compression fractures should have healed at the time of his examination, Dr. Rowan could not tell whether that was the case without a current bone scan, which he recommended.
19. Both Dr. Taft and Dr. Rowan have emphasized the importance of ongoing treatment of plaintiff's osteoporosis. However, this was a pre-existing condition which was not caused or aggravated by plaintiff's employment with Wal-Mart. Ongoing medical treatment for plaintiff's osteoporosis was not necessitated by plaintiff's work-related injuries of August 8, 1998 or December 21, 1998.
20. Ongoing treatment for plaintiff's osteoporosis would include use of Fosamax or Miacalcin. Neither has a primary purpose of pain treatment, although there are indications that Miacalcin mitigates the pain of compression fractures secondary to osteoporosis. These medications aid in adding calcium to the bone and in preventing future compression fractures.
21. As both Dr. Taft and Dr. Rowan have testified, the primary limiting factor in plaintiff's ability to return to any type of employment is her osteoporosis, not the compression fractures. However, the compression fractures are also a contributing factor in plaintiff's disability.
22. Both Dr. Taft and Dr. Rowan have stated their opinions that plaintiff might be able to perform a sedentary job with no lifting requirements, although Dr. Taft is not optimistic about such possibilities. As he previously indicated, Dr. Taft did not expect plaintiff to return to work in 1996, following her earlier injury at McDonald's. Dr. Rowan recommended a functional capacity evaluation. Any job which would require lifting would put plaintiff at risk for further injury to her back.
23. Although plaintiff has lifting restrictions and has not returned to gainful employment, neither Dr. Taft nor Dr. Rowan nor any other treating physician has indicated that plaintiff is incapable of taking care of herself at this time. No physician has written orders for assistance or attendant care for plaintiff.
24. Plaintiff's son, Robert Clark, Jr., left the Army and began living with plaintiff in January 1999. He testified that he believed plaintiff needed his help and could not live alone. He performs chores such as cleaning the house, doing dishes, driving plaintiff to the store and shopping. While Mr. Clark's willingness to assist his mother is admirable, the evidence fails to show that such attendant care is medically necessary. Even if such ongoing care is needed, it is due to plaintiff's pre-existing osteoporosis, and not the foot injuries or the compression fractures.
25. As a result of plaintiff's foot injuries of August 8, 1998, plaintiff sustained contusions and a possible fracture of her left 3rd metatarsal. Dr. Taft concluded that she had no permanent impairment to her feet due to her injuries.
26. At the request of plaintiff's counsel, on November 17, 1999 plaintiff was examined by Dr. Stephen Shaffer of Southeastern Orthopedic Evaluation Centers, Inc., for an assessment of her impairment ratings to her feet. Dr. Shaffer found no swelling and a full range of motion. He assessed some possible arterial insufficiency, but did not indicate this was related to plaintiff's foot injury. Dr. Shaffer assigned a five percent permanent impairment rating to each foot based on plaintiff's residual foot discomfort and possible aggravating effects on her bunions and status of her feet.
27. Based upon the assessments of both Dr. Taft and Dr. Shaffer, plaintiff has not sustained serious or debilitating permanent injuries to her feet. Dr. Taft found no permanent impairment and Dr. Shaffer's stated basis for his impairment rating is vague, and the ratings do not appear to be supported by any findings other than plaintiff's general complaints of discomfort. There is no evidence that plaintiff's prior foot injuries are now disabling or are a factor in whether she can return to gainful employment.
28. Although the osteoporosis is the primary limiting factor in plaintiff's ability to return to gainful employment, the compression fractures are also a significant contributing factor, especially with regard to any pain that may be produced.
29. Drs. Taft and Rowan have indicated that plaintiff may be able to perform sedentary employment, although neither physician appeared optimistic about such prospects. Given plaintiff's age and lack of education and experience, and considering her other physical limitations, neither pursuit of further employment opportunities nor retraining appear to be reasonable or viable options. Due to the combination of her osteoporosis and fractures, plaintiff will be very limited in anything she can do, especially lifting, and would be restricted to a sedentary position. Even then, it does not appear that plaintiff could work a full 6 to 8-hour day.
30. At the time of the hearing before the Deputy Commissioner, plaintiff was receiving ongoing benefits for total disability. Defendants have failed to present evidence that plaintiff is capable of earning wages in the same or any other employment, or that vocational retraining is viable.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On August 8, 1998, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant Wal-Mart, as a result of which she sustained injuries to both feet. Plaintiff has reached maximum medical improvement from these foot injuries, which are not a factor in any claim for ongoing total disability benefits. N.C. Gen. Stat. §§ 97-2(6), 97-29.
2. On December 21, 1998, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant Wal-Mart, as a result of which she sustained an injury to her back, compression fractures at L1 and L2. N.C. Gen. Stat. § 97-2(6); Clickv. Pilot Freight Carriers, Inc., 300 N.C. 164, 256 S.E.2d 389 (1980).
3. Defendants are responsible for payment of all medical expenses incurred or to be incurred by plaintiff for reasonably necessary medical treatment of her foot injuries of August 8, 1998 and her back injury of December 21, 1998. Because defendants failed to schedule a bone scan as ordered by the Commission, the Full Commission cannot determine at this time whether the compression fractures at L1 and L2 have healed. Therefore, defendants shall be responsible for ongoing medical treatment for plaintiff's back condition. The prudent medical treatment includes medication which primarily treats the osteoporosis but also mitigates the pain associated with compression fractures, such as Miacalcin or Fosamax. N.C. Gen. Stat. §§ 97-2(19), 97-25; Click v. Pilot Freight Carriers,Inc., 300 N.C. 164, 256 S.E.2d 389 (1980).
4. As a result of her back injury of December 21, 1998, compounded on her pre-existing osteoporosis of her spine, plaintiff has been and remains incapable of earning wages in the same or any other employment. As plaintiff has been receiving ongoing benefits, the burden is on defendants to show that she is capable of returning to gainful employment. The greater weight of the evidence shows that it is unlikely the plaintiff will ever be able to return to gainful employment and that she is totally and permanently disabled. Plaintiff is entitled to ongoing benefits for total and permanent disability. N.C. Gen. Stat. § 97-29.
5. The medical evidence fails to support plaintiff's claim for reimbursement for attendant care services provided by her son. N.C. Gen. Stat. §§ 97-2(19), 97-25.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendants shall pay all expenses incurred or to be incurred by plaintiff for reasonably necessary medical treatment for the injuries to her feet sustained in the accident of August 8, 1998, including the independent medical evaluation performed by Dr. Shaffer.
2. Defendants shall pay all expenses incurred or to be incurred by plaintiff for reasonably necessary medical treatment of plaintiff's back condition. Defendants are not responsible for treatment for plaintiff's osteoporosis apart from medication which primarily treats the osteoporosis but also mitigates the pain associated with compression fractures, such as Miacalcin or Fosamax.
3. Defendants shall continue to pay plaintiff benefits at the rate of $154.91 per week as compensation for total and permanent disability.
4. A reasonable attorney's fee of twenty-five percent of the compensation awarded to plaintiff herein is approved for her attorney. Hereafter, every fourth compensation check due to plaintiff shall be paid directly to her counsel.
5. Defendants shall pay the costs, including the expert witness fees previously approved for Dr. Taft and Dr. Rowan.
This the ___ day of November 2001.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ DIANNE C. SELLERS COMMISSIONER
LKM/mhb